IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO
_____

DR. MINA YUMUKOGLU,

     Plaintiff,

v.                                       No. CIV 99-1245 BB/WWD

PROVIDENT LIFE & ACCIDENT
INSURANCE COMPANY,

     Defendant.

## MEMORANDUM OPINION AND ORDER

THIS MATTER comes before the Court on Plaintiff's Motion for Partial Summary Judgment (Doc. 52), filed September 8, 2000, and Defendant's Motion for Partial Summary Judgment (Doc. 63), filed November 15, 2000. The Court has reviewed the parties' submissions and the relevant authorities, and, for the reasons set forth below, finds that both motions should be GRANTED in full.

## I.
## BACKGROUND

The parties have filed this diversity action concerning the payment of benefits under a disability insurance policy. Plaintiff, Dr. Mina Yumukoglu, is a certified Gastroenterologist. In March of 1983, Dr. Yumukoglu purchased Disability Income Policy No. 6-334-558290 from Defendant Provident Life & Accident Insurance Company ("Provident"), which provided for a lifetime monthly benefit of $5000.00 in the event Plaintiff became totally disabled. The policy was

purchased and issued in the state of Louisiana.  In December, 1997, Dr. Yumukoglu suffered a

vertebral basilar stroke which left him at least partially disabled.  Following his stroke, Dr.

Yumukoglu made a claim for total disability benefits, which was initially approved by Provident.

Benefits were paid monthly from March 23, 1998, until terminated by Provident effective June 23,

1999.[1]

 Part of the dispute at issue between the parties pertains to the policy's provisions

regarding medical conditions that existed before the policy came into effect.  The introduction to

the policy states that Provident "will pay benefits for Total Disability or other covered loss

resulting from Injuries or Sickness, subject to the definitions, exclusions, and other provisions of

this policy."  Policy at 1.  "Sickness" is defined as "sickness or disease which is first manifested

while [the] policy is in force."  Id. at 4.  The policy contains both an "Exclusions" and a "Pre-

Existing Condition Limitation" clause, also set forth on page four, which provide, respectively:

> I. EXCLUSIONS:  This policy does not cover loss caused by...(3) pre-existing
> conditions (see next provision).
>
> II. PRE-EXISTING CONDITION LIMITATION:  We will not cover loss starting
> within two years of the Effective Date of this policy which is caused by a Pre-
> existing Condition unless the condition:
>
> > 1. was disclosed and not misrepresented in answer to a question in the
> > application for this policy; and
> > 2. is not excluded by name or specific description.
>
> After two years from the Effective Date of the policy, a Pre-existing Condition
> that is not excluded by name or specific description will be covered as set forth in
> paragraph 2 of the provision titled "Incontestable."   A Pre-existing Condition
> means a sickness or physical condition:

---

[1]At the most recent pretrial conference counsel agreed that Dr. Yumukoglu's monthly
benefits have been reinstated.

1.     for which symptoms existed prior to the Effective Date of this policy which would have caused an ordinarily prudent person to have sought diagnosis, care or treatment; or

2.     for which medical advice or treatment was recommended by or received from a physician.

Id. at 4-5.

In 1979, Dr. Yumukoglu had been diagnosed with atrial fibrillation, a disorder of the heart and blood vessels for which he had been hospitalized and treated with medications on an annual basis. Although Provident's application for disability insurance policy requires information from applicants regarding their medical history, Dr. Yumukoglu failed to disclose his atrial fibrillation to Provident in his application for disability insurance. As completed, Dr. Yumukoglu's application contained the following representations:

1.     a.     Name and address of your personal physician? **Dr. Samuel Greenberg.**
          b.     Date and reason last consulted? **Ins. Physical 10-79.**
          c.     What treatment was given or medication prescribed? **none.**

2.     Have you ever been treated for or ever had any known indication of:

          d.     Chest pain, palpitation, high blood pressure, rheumatic fever, heart murmur, heart attack or other disorder of the heart or blood vessels? **no.**
          g.     Diabetes, thyroid or other endocrine disorders? **no.**

5.     *Other than above,* have you within the past 5 years:

          a.     Had any mental or physical disorder not listed above? **no.**
          b.     Had a checkup, consultation, illness, injury, surgery? **no.**
          c.     Been a patient in a hospital, clinic, sanatorium, or other medical facility? **no.**
          d.     Had electrocardiogram, X-ray, other diagnostic test? **no.**

Based on the foregoing answers, Provident was unaware of Dr. Yumukoglu's diagnosed atrial fibrillation at the time it issued his disability insurance policy. Dr. Yumukoglu admits that the atrial fibrillation was the cause, in whole or in part, of the stroke that led to his disability.

-3-

However, Dr. Yumukoglu contends that Provident is precluded from denying his benefits on the basis of his pre-existing condition because of the policy's "Incontestability" clause. Louisiana, like most states, statutorily requires that insurance policies contain incontestability clauses that place time limits on certain defenses. The policy's incontestability clause states:

INCONTESTABLE:

1.    After this policy has been in force for two years during your lifetime, we cannot contest the statements in the application.

2.    No claim for loss incurred or disability that starts after two years from the Effective Date of this policy will be reduced or denied on the ground that a sickness or physical condition not excluded by name or specific description had existed before the Effective Date of this policy.

Policy at 13. Dr. Yumukoglu contends that, although the policy professes not to cover illnesses that manifest themselves prior to policy's issuance, Paragraph 2 of the incontestability clause mandates coverage after two years regardless of when the disease was first manifested. Provident responds that pre-manifesting illnesses are specifically excluded from the scope of the policy's coverage, and argues that the incontestability clause cannot be construed to create coverage where coverage never existed. Provident asks the Court to draw a distinction between pre-*existing* illnesses (those which existed prior to the issuance of the policy, but were not yet evident) and pre-*manifesting* illnesses (illnesses which have displayed themselves before the policy went into effect). In Provident's view, paragraph 2 of the incontestability clause requires it to cover disabilities resulting from pre-existing illnesses but does not require coverage for pre-manifesting illnesses.

The second half of the parties' dispute concerns the extent of Dr. Yumukoglu's disability and Provident's decision to terminate Dr. Yumukoglu's benefits after initially approving his claim. The policy defines "total disability" as follows:

TOTAL DISABILITY means that due to Injuries or Sickness:

1.    you are unable to perform the duties of your occupation; and
2.    you are under the care and attendance of a Physician.

Policy at 4.  Following his stroke in December, 1997, Dr. Yumukoglu filed a Notice of Claim with Provident in which he claimed to be totally disabled due to his inability to perform any of the substantial and material duties of a Gastroenterologist.  The stroke caused him to experience difficulty grasping objects with his left hand, slurred speech, lack of strength on his left side, inability to concentrate or analyze problems, difficulty with word problems, headaches, and inability to drive.  Dr. Kenneth Mladinich, Plaintiff Yumukoglu's original attending physician, concluded that the disabilities caused by the stroke prevented Dr. Yumukoglu from returning to work as a Gastroenterologist.  Dr. Maria Palmer, the physician who took over Dr. Yumukoglu's case, confirmed to Provident that Dr. Yumukoglu's stroke had left him unable to drive and required that he walk with the assistance of a cane.  Surveillance conducted by Provident, however, showed Dr. Yumukoglu driving and walking at times without the use of his cane.  Dr. Yumukoglu's medical tests, including an MRI and a CT scan, were reviewed by both his own physicians and Provident's medical experts:  the evidence reveals that each party's doctors are in disagreement regarding Dr. Yumukoglu's precise level of neurological dysfunction.  A report by Dr. Edwin Curtis, a doctor of occupational medicine who reviewed Plaintiff's medical file on Provident's behalf, concluded that "[Dr. Yumukoglu's] level of activity and functioning per

surveillance, seem to be somewhat inconsistent with the alleged degree of incapacity.  The apparent assumption (his own and his attending's) that he is occupationally unable to perform the duties of his profession is not well supported by the record."  Similarly, a review of Dr. Yumukoglu's medical file and surveillance tapes by Ms. Rebecca Leger, a disability case manager with a degree in nursing, led Ms. Leger to conclude that Dr. Yumukoglu's activity level and his reported degree of incapacity were not consistent with either the medical records or the surveillance tapes.  Dr. David Goldsmith, a psychologist retained by Provident, concluded in his psychological record review that Dr. Yumukoglu was "malingering" and had potentially exaggerated the extent of his brain injury.  Dr. Yumukoglu responds by pointing to conflicting evidence in his medical reports, including neuropsychological testing performed at Provident's request by Dr. George Shute, Ph.D, a neuropsychologist retained by Provident.  Dr. Shute was unable to make a firm conclusion regarding Dr. Yumukoglu's status but concluded that some degree of cognitive dysfunction might exist.

Upon its initial payment of benefits under a reservation of rights, Provident began an investigation of Dr. Yumukoglu's claim.  In the course of its investigation, Provident learned that Dr. Yumukoglu had been diagnosed with atrial fibrillation in 1979 and had failed to disclose this information on his application.  As discussed above, Provident also concluded that Dr. Yumukoglu's medical results and lifestyle activities were inconsistent with his claim that he was totally disabled.  As a result of its investigation Provident determined that Dr. Yumukoglu was not eligible for total disability benefits and terminated his claim effective June 23, 1999.  Dr. Yumukoglu asserts that Provident had no reasonable medical basis for its conclusions and that Provident's decision to terminate his benefits was made in bad faith.

Dr. Yumukoglu also challenges a practice of Provident's known as the "Round Table review."  In 1994, Provident instituted the "Round Table" in order to review disability claims that may have been improperly paid.  In August, 1998, Dr. Yumukoglu's file was reviewed at such a Round Table session, at which time his claim was still under investigation.  The crux of Dr. Yumukoglu's theory with respect to this business practice is that Provident commonly used the Round Table as a device to improperly terminate legitimate disability claims.  These allegations are based primarily on the testimony of Dr. William Feist, Provident's former Medical Director, who resigned from Provident in 1996 as a result of his disagreement with Provident's business practices.  According to Dr. Feist:  "I think the Round Table and the procedures  that [Provident] put in place in '94, '95, and '96 were designed to enhance the bottom line of Provident, and if that meant terminating claims of legitimately disabled persons, it didn't make any different [sic].  And that's what I have objection to."  Dr. Yumukoglu's claims for bad faith and punitive damages are based in large part on Provident's alleged practice of terminating legitimate claims.

Based on the foregoing, Plaintiff Yumukoglu filed claims for breach of contract, breach of the duty of good faith and fair dealing, statutory violation of the New Mexico Unfair Insurance Practices Act, intentional infliction of emotional distress, punitive damages and attorney's fees.  Provident filed a counterclaim seeking reimbursement of all disability benefits paid to Dr. Yumukoglu, attorney's fees, and costs, as well as a declaratory judgment that Dr. Yumukoglu is entitled to no benefits for disabilities resulting from medical conditions which manifested themselves before the issuance of the policy.  Plaintiff Yumukoglu has filed a motion for partial summary judgment on the ground that the policy's incontestability clause precludes Provident from denying benefits based on his pre-existing disability.  Provident has filed its own motion for

-7-

partial summary judgment on Plaintiff's claims for breach of the duty of good faith and fair

dealing, intentional infliction of emotional distress, statutory violation of the New Mexico

Insurance Code, and punitive damages.  The Court will address each of these motion in turn.


## II.
## DISCUSSION

### A.     Standard of Review

Summary judgment is appropriate only "if the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

genuine issue as to any material fact and that the moving party is entitled to judgment as a matter

of law."  Fed. R. Civ. P. 56(c).  When applying this standard, a court must "view the evidence and

draw reasonable inferences therefrom in the light most favorable to the nonmoving party."  Simms

v. Oklahoma ex. rel. Dep't of Mental Health & Substance Abuse Serv., 165 F.3d 1321, 1326

(10th Cir. 1999).  A mere scintilla of evidence supporting the nonmoving party's theory

does not create a genuine issue of material fact.  Anderson v. Coors Brewing Co., 181 F.3d 1171,

1175 (10th Cir. 1999).  Instead, the nonmoving party must present facts such that a reasonable

jury could find in its favor.  Id.

### B.     Plaintiff's Motion for Partial Summary Judgment

Provident's counterclaim seeks, in part, the return of all disability benefits paid to Dr.

Yumukoglu and declaratory judgment that Dr. Yumukoglu is not entitled to benefits for

disabilities caused as a result of his atrial fibrillation.  Provident's primary argument in support of

its counterclaim is that the policy purports to cover only "sickness or disease that manifests itself

while [the] policy is in force."  Dr. Yumukoglu has moved for partial summary judgment on this

issue on the ground that the policy's incontestability clause bars Provident from denying him

benefits.  The relevant part of that clause, paragraph 2, states that "no claim for loss incurred or

disability that starts after two years from the Effective Date of this policy will be reduced or

denied on the ground that a sickness or physical condition not excluded by name or specific

description had existed before the Effective Date of this policy."

Both parties agree that the insurance policy is governed by Louisiana law, the state in

which the policy was issued.  See Shope v. State Farm Ins. Co., 122 N.M. 398, 400 (N.M. 1996)

(the policy of New Mexico is to interpret insurance contracts according to the law of the place

where the contract was enacted).  Louisiana, like the vast majority of states, statutorily requires

insurers such as Provident to insert the following clause in health and accident policies:

> INCONTESTABLE:  After this policy has been in force for a period of three years
> during the lifetime of the insured (excluding any period during which the insured is
> disabled), it shall become incontestable as to the statements contained in the
> application.
>
> (b)      No claim for loss incurred or disability (as defined in the policy)
> commencing after three years from the date of issue of this policy shall be reduced
> or denied on the ground that a disease or physical condition not excluded from
> coverage by name or specific description effective on the date of loss had existed
> prior to the effective date of coverage of this policy.

La. Rev. Stat. Ann. § 22:213(13).  As is evident, Provident has inserted this statutorily mandated

clause into its disability insurance policy almost verbatim, with the exception that the company has

chosen to make the clause more favorable to the policyholder by reducing the period of

incontestability from three to two years.

It is well-settled that the principal effect of such incontestability clauses "is to preclude the insurer from attempting to rescind the policy after the requisite contestability period has expired on the ground that the insured made misrepresentations in the application." Equitable Life Assurance Soc'y of U.S. v. Bell, 27 F.3d 1274, 1279 (7th Cir. 1994); see also Jackson v. Continental Cas. Co., 412 So.2d 1364, 1367 (La. 1982) (Dennis, J., concurring). "Typically, this holds true even if the insured's misstatements rise to the level of fraud." Bell at 1279; see also Provident Life and Accident Ins. Co. v. Altman, 795 F.Supp. 216, 222 (E.D. Mich. 1992). Notably, Louisiana gives insurers the option to include an exception in the incontestability clause for fraudulent misstatements by a policyholder. La. Rev. Stat. Ann. § 22.213(13)(a). Provident has expressly chosen to reject this version of the clause, presumably because the omission makes the policy more marketable.[2]

Provident concedes that the policy's incontestability clause precludes it from contesting the validity of the policy itself. Provident argues, however, that because Dr. Yumukoglu's atrial fibrillation manifested itself before the policy was in force, his resulting disability is not a "sickness" as defined by the policy, and therefore is not within the scope of coverage. The crux of Provident's argument is that the incontestability clause cannot be construed to extend coverage where coverage has never existed. There is no doubt that, with the incontestability clause put

---

[2]In Altman, supra, an identical case under Michigan law, the court made the following observations regarding Provident's omission of the "fraudulent misstatements" exception: "By failing to include the phrase in its policy, Provident has contracted not to contest statements in the application, even if those statements were fraudulently made. In other words, Provident has agreed to extend the same degree of protection to insureds who fraudulently misrepresent their medical statuses as it does to those who innocently misrepresent their statuses. Because Provident failed to include the provision as provided in the statute, it cannot have this court now include in the policy either the specific language or the public policy behind the language." 795 F.Supp. at 222.

aside, the policy does not extend coverage to those illnesses which manifested themselves before the issuance of the policy. The more difficult question is whether the clause operates to extend coverage to pre-manifesting illnesses after the period of contestability, in this case two years, has run.

There is a significant split of authority among both state and federal courts with respect to this issue. See Dale Joseph Gilsinger, Construction of Incontestable Clause Applicable to Disability Insurance, 67 A.L.R.5th 543, §§ 5[a]-[b] (1999) (summarizing cases). Several courts, including the Fifth and the Ninth Circuit, have concluded that incontestability clauses do not prevent an insurer from asserting that the insured's disability is excluded from coverage because it resulted from a pre-manifesting condition. See, e.g., Button v. Connecticut Gen. Life Ins. Co., 847 F.2d 584, 588-89 (9th Cir. 1988) (applying Arizona law); Keaten v. Paul Revere Life Ins. Co., 648 F.2d 299, 301-303 (5th Cir. June 1981) (applying Georgia law); Massachusetts Casualty Ins. Co. v. Forman, 516 F.2d 425, 428-430 (5th Cir. 1975) (applying Florida law); National Life & Acc. Ins. Co. v. Mixon, 291 Ala. 467, 282 So.2d 308 (Ala. 1973); Petty v. Metropolitan Life Ins. Co., 204 Ark. 1054, 166 S.W.2d 1034 (Ark. 1942); Prudential Ins. Co. of America v. Elias, 188 Okla. 420, 109 P.2d 815 (Okla. 1940). These courts have held that, as Provident contends, incontestability clauses relate solely to the validity of the policy and do not preclude the insurer from limiting what is covered. However, a significant number of courts, including the Sixth and Seventh Circuits, have agreed with Dr. Yumukoglu that the incontestability clause operates to cut off the insurer's defense that the insured's illness was caused by a condition which manifested itself prior to the issuance of the policy. See, e.g., Equitable Life Assurance Soc'y of U.S. v. Poe, 143 F.3d 1013, 1017-1020 (6th Cir. 1998) (applying Michigan law); Bell, 27 F.3d at 1277-1283

-11-

(applying Indiana law); <u>Altman</u>, 795 F.Supp. at 220-222 (applying Michigan law); <u>Fischer v.</u>

<u>Massachusetts Casualty Ins. Co.</u>, 458 F.Supp. 939, 943-944 (S.D.N.Y. 1978) (applying New

York law); <u>Penn Mut. Life Ins. Co. v. Oglesby</u>, 695 A.2d 1146 (Del. 1997); <u>Estate of Doe v. Paul</u>

<u>Revere Ins. Group</u>, 86 Haw. 262, 948 P.2d 1103 (Haw. 1997); <u>Insurance Com'r of State of</u>

<u>Maryland v. Mutual Life Ins. Co. of New York</u>, 111 Md. App. 156, 680 A.2d 584 (Md. App.

1996); <u>Kersten v. Minnesota Mutual Life Ins. Co.</u>, 608 N.W.2d 869 (Minn. 2000).  These cases

reflect the modern trend, which is to preclude defenses based on a "first manifestation" theory.

<u>See</u> Erin Wessling, Note, Contracts--Applying the Plain Language to Incontestability Clauses:

<u>Kersten v. Minnesota Mutual Life Ins. Co.</u>, 608 N.W.2d 869 (Minn. 2000), 27 Wm. Mitchell L.

Rev. 1253, 1262 (2000).

      The first question posed by Provident's argument is whether pre-manifesting illnesses are

sicknesses "excluded by name or specific description" from coverage under the policy.  It is well

accepted that incontestability clauses do not preclude insurers from expressly excluding coverage

for losses arising from specific causes.  <u>See</u> <u>Bell</u>, 27 F.3d at 1279.  The policy's incontestability

clause provides that, after two years, "no claim...will be reduced or denied on the ground that a

sickness or physical condition *not excluded by name or specific description*" existed prior to the

effective date of coverage of the policy (emphasis added).  Provident contends that this provision

alone bars coverage for Dr. Yumukoglu's disability because the policy covers only "sickness or

disease which is first manifested while [the] policy is in force."  In other words, because the

policy's definition of "sickness" excludes those illnesses which manifest themselves before the

effective date of the policy, pre-manifesting illnesses fall under the category of illnesses "excluded

by name or specific description."

Louisiana, like most states, has directly rejected this argument.  In two of the principal Louisiana cases construing the scope of incontestability clauses, the Louisiana Supreme Court held that a disease must be specifically excepted by name in an incontestability clause in order to be excluded from coverage.  See Garrell v. Good Citizens Mut. Ben. Ass'n, Inc., 16 So.2d 463, 465 (La. 1943); Bernier v. Pacific Mutual Life Ins. Co. of California, 139 So. 629, 632 (La. 1932).  In Garrell, the plaintiff beneficiary sued on an insurance policy which contained a clause that reduced benefits in the event the insured died from a specific list of diseases, including tuberculosis, contracted within one year from the effective date of the policy.  The insured died from tuberculosis he had contracted prior to the issuance of the policy, and the insurance company, citing the exclusionary provision, refused to pay full benefits.  The policy also contained an incontestability clause which read as follows:  "This Policy shall be incontestable after two years from date except as stated in conditions and for nonpayment of premiums."  16 So.2d at 464.  The Louisiana court held that because the language excluding tuberculosis from coverage was not specifically repeated in the incontestability clause, the exclusion remained in force only during the one-year period of contestability:

> The term incontestability is very broad and in our opinion covers all grounds not specifically excepted in the incontestability clause....Where a policy seeks to limit coverage on death occurring from tuberculosis by the insertion of a condition and does not specifically except same in the incontestability clause, the reasonable interpretation is that the condition remains in force only until the period of time has elapsed making the policy incontestable, thereby giving effect to both the clause containing the condition and the incontestability clause.  Otherwise, the incontestability clause would be nullified insofar as the condition is concerned.

Id. at 465.  The court summarized the similar holding of Bernier, supra, as follows:

> From our appreciation of the case of Bernier...the holding is to the effect that a defense is barred when the policy becomes incontestable, except where it is

-13-

preserved in the incontestability clause, irrespective of whether it is based on a denial of coverage or a plea of the breach of the conditions of the policy.  In other words, all defenses not specifically excepted in the clause making the policy incontestable are barred when the period of time fixed in the incontestability clause has elapsed.

Id.

Subsequent Louisiana cases affirm the principle set forth in Bernier and Garrell that an incontestability clause bars all defenses by an insurer, including the defense of lack of coverage, unless the excluded disease is specifically set forth in the incontestability clause.  See Harris v. First Assurance Life of America, 532 So.2d 139 (La. 1988) (reversing judgment of First Circuit Court of Appeals, 526 So.2d 245, for reasons stated in dissent); Jackson v. Continental Cas. Co., 412 So.2d 1364, 1365 (La. 1982) (Dennis, J., concurring); Penn v. Lighthouse Life Ins. Co., 392 So.2d 181, 182 (La. App. 2d Cir. 1980); Gordon v. Unity Life Ins. Co., Inc., 30 So.2d 880, 880-881 (La. 1947) (beneficiary could not recover under policy when insured died from syphilis and the incontestability clause specifically excepted benefits for "death resulting from violation of law, immorality, alcoholism, venereal diseases or from an intentional act of any person other than the insured"); Landry v. Unity Life Ins. Co., Inc., 31 So. 2d 429, 430-31 (La. App. 2d Cir. 1947); see also Eric K. Fosaaen, Note, AIDS and the Incontestability Clause, 66 N.D. L. Rev. 267, n.100 (1990).  Because the cause of Dr. Yumukoglu's stroke, atrial fibrillation, is not sufficiently excepted from the policy's incontestability clause, the Court finds that it is not an illness "excluded by name or specific description."   Under Louisiana law, to say that all pre-manifesting illnesses fall under the category of those illnesses excluded by "specific description" would improperly narrow the scope of the policy's coverage.  This also comports with the general rule of construction that contractual provisions are to be given their plain, ordinary, and common

-14-

sense meaning.  See Bell, 27 F.3d at 1280 (quoting Wischmeyer v. Paul Revere Life Ins. Co., 725

F.Supp. 995, 1004-1005 (S.D. Ind. 1989); Jackson, 412 So.2d at 1366 (Dennis, J., concurring).


        The second question raised by Provident is whether, despite the language of the

incontestability clause prohibiting a denial of coverage for pre-*existing* conditions, Provident is

free to deny coverage for pre-*manifesting* conditions.  The Louisiana courts have not addressed

the precise question of the "first manifestation" doctrine.  However, the Court finds the distinction

between pre-existing and pre-manifesting illnesses to be unpersuasive.  It would be a rare

circumstance where coverage would be denied for a medical condition totally unknown to the

applicant at the time of application.  Based on the foregoing analysis of Louisiana precedent, the

Court believes that the Louisiana Supreme Court would agree that this is not the proper role of an

incontestability clause.  As stated in Bernier, supra:  "In a suit on [an]...insurance policy, the

question whether the defense set up by the insurance company is barred by the incontestability

clause...depends upon whether all that is said in the policy leaves no reasonable doubt that the

defense set up by the company is not barred by the incontestability clause."  139 So.2d at 633.  In

this case, considerable doubt can be cast upon Provident's interpretation of the incontestability

clause.  "Pre-existing," as stated in the incontestability clause, could be read to include both

illnesses which have manifested themselves and those which have not.  Provident would have the

Court read "pre-existing" to include only those illnesses which existed but did not manifest

themselves prior to the effective date of the policy; diseases which had manifested themselves

would not be within the scope of the clause.  The Court believes that Provident's subtle

distinction belies the plain meaning of the clause.  As stated by the Sixth Circuit in Poe, supra:

> The language of the Inconstestability Clause is quite clear; the language does not
> suggest that the term "existed" should be read in any way except in its plain,
> ordinary, and popular sense.  Like the Seventh Circuit in <u>Bell</u>, we believe that a
> condition which has manifested can also be said to exist; the category of existing
> conditions logically includes those conditions that have already manifested
> themselves.  Thus, we believe that the plain meaning of "existed" includes all
> conditions that were in being, whether manifested or not.

143 F.3d at 1018.  <u>See also</u> <u>Bell</u>, 27 F.3d at 1281-82.

Accordingly, this Court agrees with the growing majority of courts who have rejected the

"first manifestation" doctrine.  At best, were the Court to accept Provident's interpretation of the

"pre-existing" language in the incontestability clause, such a reading would render the contract

ambiguous.  As the Louisiana Supreme Court recently affirmed, when determining whether an

insurance policy affords coverage for a particular disability, "any ambiguities within the policy

must be construed in favor of the insured to effect, not deny, coverage."  <u>Doerr v. Mobil Oil

Corp.</u>, ---So.2d---, 2000 WL 1880265, *3 (La. Dec. 19 2000); <u>see also</u> <u>Credeur v. Luke</u>, 368

So.2d 1030, 1032 (La. 1979).

Finally, Provident repeatedly argues that public policy would not be served by allowing

applicants who fraudulently misrepresent their medical history to benefit from the protection of

the incontestability clause.  However, the risk of fraud is outweighed by the public policy behind

incontestability clauses, which recognizes that, in the interests of certainty and judicial economy,

there should a set time beyond which an insurance company is precluded from raising particular

defenses.  <u>See</u> <u>Bell</u>, 27 F.3d at 1279; <u>Altman</u>, 795 F.Supp. at 221-222; <u>Jackson</u>, 412 So.2d at

1367 (Dennis, J., concurring) ("The incontestability clauses are enforced with particularity

because of the desirable purpose which they have.  It is their purpose to put a checkmate on

litigation; to prevent, after the lapse of a certain period of time, an expensive resort

-16-

to the courts--expensive both from the point of view of the litigants and that of the citizens of the state"). The Louisiana courts specifically rejected the fraud argument in <u>Penn</u>, 392 So.2d at 182, stating: "Even should we assume that the beneficiary made false and material misrepresentations with the intent to deceive as contemplated by [statute], the policy sued on precludes the insurer from raising this defense after one year of its date of issue in an incontestability provision...the legal effect of such a provision is well settled." As discussed above, Provident has also explicitly chosen to reject its statutory option to include an exception in its incontestability clause for fraudulent misstatements by an insured. <u>See</u> n. 1, supra. Provident had two years in which to investigate Dr. Yumukoglu's medical history, and it failed to do so. The Court finds Provident's public policy argument to be completely unsupported.

Plaintiff's motion for partial summary judgment is therefore granted.

**C.      Defendant's Motion for Partial Summary Judgment**

Defendants have filed a motion for partial summary judgment on Plaintiff's claims for breach of the duty of good faith and fair dealing, statutory violation of the New Mexico Unfair Insurance Practices Act, intentional infliction of emotional distress, and punitive damages. Each of these claims arises from Dr. Yumukoglu's contention that Provident terminated his benefits in bad faith. Provident argues that it had a reasonable basis for its decision to terminate Dr. Yumukoglu's benefits and, as a result, there is no issue of material fact sufficient to support Plaintiff's bad faith claims. Both parties agree that, while the substantive terms of the insurance policy are governed by the law of Louisiana, Plaintiff's tort claims are governed by New Mexico law. <u>See</u> <u>Novell, Inc. v. Federal Ins. Co.</u>, 141 F.3d 983, 985 (10th Cir. 1998) (in a diversity action the court applies the substantive law of the forum state).

-17-

1.      **Breach of the Duty of Good Faith and Fair Dealing**

Under New Mexico law, "there is an implied covenant of fair dealing which creates an

obligation between the parties [to an insurance contract] to act in good faith." Suggs v. State

Farm Fire and Cas. Co., 833 F.2d 883, 890 (10th Cir. 1987); Ambassador Ins. Co. v. St. Paul Fire

& Marine Ins. Co., 102 N.M. 28, 30, 690 P.2d 1022, 1025 (N.M. 1984); see also Chavez v.

Chenoweth, 89 N.M. 423, 553 P.2d 703 (N.M. Ct. App. 1976). "New Mexico recognizes the

tort of bad faith delay or refusal to pay a valid claim by an insured." Suggs, 833 F.3d at 890

(citing State Farm General Ins. Co. v. Clifton, 86 N.M. 757, 527 P.2d 798 (N.M. 1974).

Bad faith in the context of an insurance claim has been defined as "a frivolous or

unfounded refusal to pay" by the insurer. Suggs, 833 F.3d at 890; Chavez, 89 N.M. at 429, 553

P.2d at 709; State Farm, 86 N.M. at 759, 527 P.2d at 800. It is not necessary that the refusal to

pay be fraudulent. State Farm, 86 N.M. at 759, 527 P.2d at 800. The New Mexico Supreme

Court articulated the definition of an "unfounded" refusal to pay a claim in Jackson Nat'l Life Ins.

Co. v. Receconi:

> "Unfounded" in this context does not mean "erroneous" or "incorrect"; it means
> essentially the same thing as "reckless disregard," in which the insurer "*utterly*
> fail[s] to exercise care for the interests of the insured in denying or delaying
> payment on an insurance policy." Jessen v. Nat'l Excess Ins. Co., 108 N.M. 625,
> 628, 776 P.2d 1244, 1247 (1989) (emphasis added). It means an utter or total
> lack of foundation for an assertion of nonliability--an arbitrary or baseless refusal
> to pay, lacking any arguable support in the wording of the insurance policy or the
> circumstances surrounding the claim. It is synonymous with the word with which
> it is coupled: "frivolous."

113 N.M. 403, 419, 827 P.2d 118, 134 (N.M. 1992). An insurer's incorrect decision to refuse

benefits, without more, is not enough to establish bad faith. Winters v. Transamerica Ins. Co.,

194 F.3d 1321, 1999 WL 699835 at **4 (10th Cir., Sept. 9, 1999); United Nuclear Corp. v.

Allendale Mut. Ins. Co., 103 N.M. 480, 485, 709 P.2d 649, 654 (N.M. 1985) (when there are

legitimate questions regarding the payment of benefits, it cannot be said that the insurer acted in

bad faith).  To show bad faith, "there must be no reasonable basis for denying the claim."

Winters, 1999 WL 699835 at **4; see United Nuclear Corp., 103 N.M. at 485, 709 P.2d at 654;

see also Jessen v. Nat'l Excess Ins. Co., 108 N.M. 625, 627, 776 P.2d 1244, 1246 (N.M. 1989)

(overruled on other grounds by Paiz v. State Farm Fire & Cas. Co., 118 N.M. 203, 880 P.2d 300

(N.M. 1994)).

      Dr. Yumukoglu argues that summary judgment on his bad faith claims is not appropriate

because the issue of good faith is generally a question of fact for the jury.  See General Motors

Acceptance Corp. v. Anaya, 103 N.M. 72, 76, 703 P.2d 169, 173 (N.M. 1985).  However, the

Tenth Circuit has repeatedly held that summary judgment is warranted on a bad faith claim when

the insurer has a reasonable basis for its decision to deny benefits.  See Oulds v. Principal Mut.

Life Ins. Co., 6 F.3d 1431, 1436-37 (10th Cir. 1993):

> The mere allegation that an insurer breached the duty of good faith and fair dealing
> does not automatically entitle a litigant to submit the issue to a jury for
> determination. A jury question arises only where the relevant facts are in
> dispute or where the undisputed facts permit differing inferences as to the
> reasonableness and good faith of the insurer's conduct.  On a motion for summary
> judgment, the trial court must first determine, under the facts of the particular case
> and as a matter of law, whether the insurer's conduct may be reasonably perceived
> as tortious. Until the facts, when construed most favorably against the insurer,
> have established what might reasonably be perceived as tortious conduct on the
> part of the insurer, the legal gate to submission of the issue to the jury remains
> closed.

(internal citations omitted); see also Winters, 1999 WL 699835 at **5; Hays v. Jackson National

Life Ins. Co., 105 F.3d 583 (10th Cir. 1997) (affirming grant of summary judgment for insurer on

bad faith claim); Wolf v. Prudential Ins. Co. of Amer., 50 F.3d 793, 799 (10th Cir. 1995)

(upholding grant of summary judgment on bad faith claim where insurer had a reasonable basis for denying coverage); Suggs, 833 F.2d at 891 (reversing denial of insurer's motion for judgment as a matter of law when insurer had a good faith basis for withholding payment).

In this case, the evidence before the Court demonstrates that Provident had a reasonable basis for its decision to terminate Dr. Yumukoglu's disability benefits.  There is substantial conflicting evidence regarding the severity of Dr. Yumukoglu's neurological dysfunction. Surveillance conducted by Provident prior to the termination of Dr. Yumukoglu's benefits showed him driving a car and walking without using a cane, in direct contradiction to his claimed disabilities.  Both a doctor of occupational medicine and a disability case manager nurse retained by Provident concluded that Dr. Yumukoglu's level of activity, based on his medical files and surveillance tapes, was not consistent with his alleged degree of incapacity.  While Dr. George Shute, a neuropsychologist retained by Provident, was unable to make a firm conclusion regarding Dr. Yumukoglu's status, he did conclude that Dr. Yumukoglu's test findings were inconsistent with the result of his MRI and felt that Dr. Yumukoglu was exerting less than full effort during his examination.   A review of Dr. Shute's tests and the surveillance tapes by psychologist Dr. David Goldsmith led Dr. Goldsmith to conclude that Dr. Yumukoglu might be malingering.

Nor do Dr. Yumukoglu's allegations regarding Provident's "insidious" business practice, the Round Table review, raise a genuine issue of material fact.  Dr. Yumukoglu argues that Provident had a history of improperly terminating legitimate disability claims.  His allegations are based solely on the testimony of Dr. William Feist, a former Provident employee, who resigned from Provident prior to the filing of Dr. Yumukoglu's claim.  In Dr. Feist's opinion, the Round Table policy was designed to review and terminate legitimate disability claims.  Dr. Yumukoglu

-20-

argues that, based on Dr. Feist's testimony, a reasonable jury could find that Provident's termination of his claim was unfounded.  However, Dr. Feist acknowledges that the Round Tables were designed to review claims that may have been "wrongly adjudicated," i.e., those claims for which disability benefits had been improperly paid.  Although Dr. Feist disagreed personally with Provident's alleged practice of terminating benefits several years after the claims had been adjudicated, at no point in his testimony does he claim that the termination of benefits was improper or illegal.  In addition, Dr. Feist states in his testimony that his primary concern was the review of claims that were several years old:  in this case, Dr. Yumukoglu's disability status was reviewed within six months of his initial claim under Provident's reservation of rights.  Dr. Feist concedes both that he has no personal knowledge of Dr. Yumukoglu's claim and that he could not recall a single instance in which a decision to deny a disability claim was made at a Round Table session.  While Dr. Feist may be competent to testify to his opinions regarding Provident's business practices during his tenure at the company, it is evident from his deposition that his general impressions are inapplicable to this case and are therefore irrelevant.  Conclusory allegations, without specific supporting facts, have no probative value and are therefore insufficient to create a genuine issue of material fact.  See Thomas v. International Business Machines, 48 F.3d 478, 485-86 (10th Cir. 1995); Evers v. General Motors Corp., 770 F.2d 984,

986 (11th Cir. 1985).[3]  The Court finds that Dr. Feist's testimony is not sufficient to raise a genuine issue of material fact regarding Provident's bad faith handling of Dr. Yumukoglu's claim.

As a matter of law, Provident's decision to terminate Dr. Yumukoglu's benefits was neither frivolous nor unfounded, and therefore was not in bad faith.  Defendant's motion for summary judgment on Plaintiff's claim for breach of the duty of good faith and fair dealing is therefore granted.

### 2.      Statutory Violation of New Mexico Unfair Insurance Practices Act

Dr. Yumukoglu alleges generally that Provident's conduct "violates one or more of the provisions of Section 59A-16-20 NMSA 1978 (1984)," the section of the New Mexico Unfair Insurance Practices Act[4] that prohibits unfair claims practices.  See Second Amended Complaint (Doc. 41) at 6.  Dr. Yumukoglu does not specify which of the fifteen provisions of this section he feels Provident has violated, and after a review of the statute, the Court cannot perceive which subsection could have been violated under the fact alleged.  At the very least, Dr. Yumukoglu has failed to comply with the pleading requirements of Federal Rule of Civil Procedure 8(a)(2).  Rule 8(a)(2) requires that a civil complaint set forth "a short and plain statement of the claim showing that the pleader is entitled to relief."  Carpenter v. Williams, 86 F.3d 1015, 1016 (10th Cir. 1996).

---

[3]Similarly, Dr. Feist's observations are not enough to suggest evidence of a routine business practice under Fed. R. Evid. 406.  "To obtain a Rule 406 inference of the routine practice of the business, a plaintiff must show a sufficient number of specific instances of conduct to support that inference.  Evidence of the defendant's actions on only a few occasions...are not enough; the plaintiff must show regularity over substantially all occasions or with substantially all other parties with whom the defendant has had similar business transactions."  Mobil Exploration and Producing U.S., Inc. v. Cajun Const. Serv., Inc., 45 F.3d 96, 99-100 (5th Cir. 1995); see also Farris v. County of Camden, 61 F.Supp.2d 307, n. 9 (D.N.J. 1999).

[4]NMSA 1978, § 59A-16-1 et. seq.

Here, it is not clear either what Dr. Yumukoglu is claiming or to what relief he is entitled under §

56A-16-20.  Dr. Yumukoglu's claim appears, like his claim for breach of the duty of good faith

and fair dealing, to be based on Provident's alleged bad faith in terminating his disability benefits.

As discussed above, the Court finds that Provident's decision to terminate Dr. Yumukoglu's

benefits did not amount to bad faith.  Provident's motion for summary judgment on Plaintiff's

claim for statutory violation is granted.

### 3.       Intentional Infliction of Emotional Distress

In order to recover for the tort of intentional infliction of emotional distress the claimant

must show "that the tortfeasor's conduct was extreme and outrageous under the circumstances,

that the tortfeasor acted recklessly, and that as a result of the conduct the claimant experienced

severe emotional distress."  Coates v. Wal-Mart Stores, Inc., 127 N.M. 47, 57, 976 P.2d 999,

1009 (N.M. 1999); see also UJI 13-1628 NMRA 1999.  Extreme and outrageous conduct is

described as conduct "so outrageous in character, and so extreme in degree, as to go beyond all

possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized

community."  Silverman v. Progressive Broadcasting, Inc., 125 N.M. 500, 509, 964 P.2d 61, 70

(N.M. App. 1998) (quoting Restatement (Second) of Torts § 46 cmt. d.).  When, as here, an

insurer's decision to terminate disability benefits does not rise to the level of bad faith, that

decision cannot possibly be characterized as conduct "extreme and outrageous in character" as

required to maintain an action for intentional infliction of emotional distress.  See Meyer v.

Conlon, 162 F.3d 1264, 1273-1275 (10th Cir. 1998); Thompson v. State Farm Fire and Cas. Co.,

34 F.3d 932, 942 (10th Cir. 1994).  Provident's motion for summary judgment on Plaintiff's claim

for intentional infliction of emotional distress is granted.

### 4.  Punitive Damages

Under New Mexico law, an award of punitive damages in a breach of contract case must be predicated, at a minimum, upon a showing of bad faith.[5]  See, e.g., Allsup's Convenience Stores, Inc. v. North River Ins. Co., 127 N.M. 1, 16-17, 19, 976 P.2d 1, 16-17, 19 (N.M. 1998); Paiz v. State Farm Fire and Cas. Co., 118 N.M. 203, 210-211, 880 P.2d 300, 307-308 (overruling previous line of cases which suggested that, in cases involving breach of insurance contracts, punitive damages may be predicated solely upon gross negligence); United Nuclear Corp. v. Allendale Mut. Ins. Co., 103 N.M. 480, 485, 709 P.2d 649, 654 (N.M. 1985) ("to assess punitive damages for breach of an insurance policy there must be evidence of bad faith or malice in the insurer's refusal to pay the claim"); Ambassador Ins. Co. v. St. Paul Fire & Marine Ins. Co., 102 N.M. 28, 30-31, 690 P.2d 1022, 1023-25 (N.M. 1984) (unless negligence by insurance company rises to level of bad faith, it cannot give rise to damages other than those arising from breach of contract).  Because Provident's conduct in this case did not rise to the level of bad faith, Plaintiff has not met the standard for assessment of punitive damages.  Dr. Yumukoglu can be entitled to no more than compensatory damages for breach of contract.  Defendant's motion for summary judgment on Plaintiff's claim for punitive damages is granted.

---

[5]The New Mexico Court of Appeals, in Teague-Strebeck Motors v. Chrysler Ins., interpreted the New Mexico Supreme Court opinions in Paiz and Allsup's Convenience Stores, infra, to have altered the standard for punitive damages in breach of insurance cases to require an "evil motive or culpable mental state" in addition to bad faith.  127 N.M. 603, 621, 985 P.2d 1183, 1201 (N.M. Ct. App. 1999).  This is in contrast to the existing Uniform Jury Instruction on the availability of punitive damages in bad faith insurance actions, which requires only a showing of bad faith as a basis for an award of punitive damages.  See NM UJI 13-1718.  The New Mexico Supreme Court has not expressly considered the question posed by Teague-Strebeck.  See Hobbs v. Nutmeg Ins. Co., 2000 WL 1763455, *5 (10th Cir., November 30, 2000).  Because the Court finds that, in this case, Dr. Yumukoglu has failed to make the minimum showing that Provident acted in bad faith, we do not reach this question here.

**III.**
**CONCLUSION**

For the reasons set forth above, the Court hereby GRANTS Plaintiff's motion for partial summary judgment on the ground that Defendant is precluded from denying benefits to Plaintiff based on Plaintiff's pre-manifesting disability.  The Court also GRANTS Defendant's motion for partial summary judgment on Plaintiff's claims for breach of the duty of good faith and fair dealing, statutory violation of the New Mexico Unfair Insurance Practices Act, intentional infliction of emotional distress, and punitive damages.

IT IS SO ORDERED.


Dated at Albuquerque this 2d day of February, 2001.


BRUCE D. BLACK
United States District Judge